Evans *v.* Evans.

4-9956                                     241 S. W. 2d 713

Opinion delivered July 9, 1951.

*F. O. Butt,* for appellant.

*Claude A. Fuller,* for appellee.

ROBINSON, J.  This appeal is from a decree of the Chancery Court granting a divorce to the appellee.  The appellee alleged in his complaint that his wife had been guilty of such conduct as to render his condition in life intolerable; that she had openly kept company with men late at night, drinking liquor, attending dances, and neglecting the children of appellee.  Defendant denied the allegations of the complaint, except that of the marriage, and alleged that the plaintiff, for more than 18 months, had maintained and kept a woman named Genie, (it is not necessary to set out here her last name) and had had numerous assignations with her.  The effect of appellant's allegation of wrong-doing on the part of the appellee was to set up the defense of recrimination.

In 1944 the appellee obtained a divorce from a former wife in Mexico, then married appellant.  He had three children by the former marriage, two boys and one girl, a baby in arms.  The appellee obtained custody of the two boys.  In 1947 it was ascertained that the divorce he had obtained in Mexico was not valid, and appellee, therefore, procured another divorce from the same person and then remarried his present wife.  Soon after their marriage, the appellee, his wife and two boys moved to Eureka Springs, Arkansas.  Because his duties in the United States Navy, in which he has served for many

years, required him to be elsewhere, appellee was at home in Eureka Springs for only short periods of time.

In April, 1949, appellee began an extended cruise, returning in September of that year, at which time his wife with the two boys met him at Virginia Beach, where they lived together until the 9th day of January, 1950, when his wife left him. On the 13th day of September, 1950, the appellee filed this suit.

There does not appear to be any question about the domicile, for the parties agree that they had not abandoned Eureka Springs as their residence. There are two issues in the case: First, did the appellee make out a case under the statute which makes conduct rendering one's condition in life intolerable a ground for divorce? Second, if the appellee did make out a case under the statute, is appellant's plea of recrimination as a defense sustained?

The appellee testified that he knew nothing about anything that could be called improper conduct on the part of his wife while she lived at Eureka Springs. Although appellee did testify that his wife had been put out of a petty officer's club at Virginia Beach because of obscene language and conduct, such testimony is not corroborated. Also, the appellee testified that his wife was jealous and embarrassed him by complaining to his superior officers in the Navy. Furthermore, he says his wife left their apartment without just cause on the night of January 9, 1950. Desertion is not alleged as a ground for divorce and sufficient time had not expired from the time his wife left to the time of the filing of the suit to sustain a plea of desertion, even if she had left without just cause, which we do not hold.

Within ten days after appellant left the apartment at Virginia Beach she entered a Naval Hospital where she underwent an operation whereby one of her breasts was removed. At a later date she underwent another operation for a condition in the region of the pelvis, and still another when the other breast was removed. She is now in need of a fourth operation. At the time appellant

left the apartment at Virginia Beach, she was sick, mentally and physically, and needed an operation.

In an attempt to prove improper conduct on the part of his wife at Eureka Springs, the appellee produced some evidence to the effect that her reputation was bad, without the witnesses being able to point out any improper conduct on the part of the appellant. Appellant was seen a few times, under circumstances not improper, with a good friend of the appellee. The appellee encouraged his wife in that respect and sent to this friend, through his wife, a wrist-watch for Christmas. It is true that appellee's mother testified that on one occasion she hid in a garage near appellant's home at Eureka Springs and heard appellant invite some "rough talking" man into the house. Her testimony is not convincing, especially when she stands impeached by a letter from the appellee, which is as follows:

"My dear Mother:

"I received your two letters, one yesterday and the other today. It would be proper for me to say I was glad to get them but in this case to be proper would not be truthful since I did not enjoy them and neither of them was appreciated. Neither of them deserve an answer, but if it can possibly prevent more like them, I'm going through them and attempt one.

"I have been extremely busy and haven't been down town since I returned from St. Louis after Thanksgiving. For that reason I asked Pearl to send a Christmas card to you for me, which she did. I probably wouldn't have done that if it hadn't been for that one letter you wrote me just before Christmas. It was the only one I've received from you that wasn't full of back-biting and half-truths.

"I don't know what reasons you have figured out for yourself that give me cause for worry but I can assure you that your left-handed reference to Pearl and the children are the one thing I have no cause at all to worry about. No man could ask for a wife who is more loving, more subservient to her husband's welfare, and more

devoted in her training of the children to teach them the value of family and a home and to attempt to make good men of them with a normal adjustment to life and the world without either babying or spoiling them. Such training can only be given with a complete absence of outside interference. Even more than that, there must be outside cooperation but that cooperation must be chosen with care. I do not believe that the influence of one such as Berry, either directly or as it works out, indirectly, is of any benefit to them. I have told you I do not care to discuss the subject of Berry but in answer to your letter I must say just one thing. As you say, I think I know the truth about Berry, but it does not necessarily follow that I believe the truth is as you told it. There are too many concrete things that cannot be overlooked. . . .

"Now, about that sewing machine—you will eventually get it, I say eventually because I have no idea how soon it will be. I will say this—the machine was given to Pearl as a gift, it is her machine. It is only in order to make her life a little more bearable as it would most definitely be without your constant nagging about it that I will ask her to give you the machine when the following two conditions are satisfied: 1. That I can find a machine for her to replace it and buy it for her and 2. That my dishes are returned to my home either prior to or at the time the machine is given to you.

"I am at a loss to know why you mention it so often, but I can certainly find no fault in Pearl's choice to include the Rev. and Mrs. Stokes among her circle of friends. In fact, I have acted in an advisory capacity to Pearl in some of their discussions, especially where the Hebrew Ethical Wills are included since that stems from those contained in two volumes of my library that Rev. Stokes has borrowed. Neither can I find fault in the studies and discussion of all religions since in those discussions only can bigotry and intolerance be combatted. I do object, and Pearl was angry because I was, to your inferential method of shading the truth of what I already know is an all too transparent attempt to sow discord."

This letter was turned over to the appellant by appellee's mother.

There is no substantial evidence in the record that the appellant kept company with men late at night, attended dances, drank liquor, or neglected the children, which would justify a divorce on the ground of indignities or any other ground. There is evidence to the effect that the appellant was jealous and, as a result of this jealousy, she wrote some indiscreet letters to Genie, and complained to the Navy Department. But, if appellant's conduct due to jealousy could be held to be grounds for divorce as rendering appellee's condition in life intolerable, that ground would be barred by appellee's misconduct amounting to recrimination.

Upon examination of the record, we are convinced that appellee, who was stationed at Bethesda, Maryland, was having an illicit affair with Genie, who lived in Washington, D. C., and that such relationship had existed since 1947. On June 5, 1949, appellee wrote to his wife:

"You wanted to know why I went to Washington when I came back from Gitmo Bay. . . . I did not see J............ while I was there, with the result that we had one big fight because, as I have told you, I had done a lot of thinking in Gitmo and come to the conclusions that were not very well liked in all quarters. It was not my desire for her to come to Norfolk and that is the reason why I wired her not to do so. I did not know whether you would want to see me at all or not, and that is the reason I wired you that I was there and did not say anything about coming down. I do not regret the trip to Washington since if I hadn't come down, I wouldn't have known whether my thinking in Gitmo was really true, or was a case of distance smoothing over feelings. You know what I found out and when it was told to J............, it started the fight; at which time I walked out as I have done before, but this time there was no opportunity for telephone calls to start it over again as there was the other times. . . . I think you are doing right in not accepting any calls from Washington because I know how upsetting they are to you, and that you do not know whether to

believe what I say from now on. I am doing just what you want me to do and giving a truthful answer, and I say this—you can believe what I say. from now on. I am so nervous I can hardly write.''

On July 7, 1949, appellee wrote the appellant:

''We are trying to save the children from the stigma brought on by my own follies, and a course such as you have set will ruin them as much, no, more than if it were me. Many of the things I have said are the result of the remorse I feel in trying to salve my guilty conscience. . . . I know I am not deserving either to love or to be loved by you because I was so weak as not to be able to resist a plum when it was offered me. I took it and imagined myself in love. I did not realize it was so long ago. I have a lousy memory for chronology and dates as you say. It is hard for me to believe that it goes back as far as April, 1947. . . . I have always felt that my love for you was real, but if that were true would I have strayed off the path so easily and done the things I did? The only thing I can say for myself is that I tried several times to stop it, but that does not hold much water since each time I thought it was stopped for good it got started again.''

The following is a copy of a letter which the evidence shows was sent by Genie to appellee:

''We must and we will keep our chins up high for one another. I don't want my precious to lose any weight or to worry until you are sick and have a breakdown, because I have a feeling this trip has done you a world of good, and I just won't stand for her to make you ill with worry; and, darling, please try to sleep because your Genie wants you to. Please call me as soon as you arrive in Norfolk and here is my office phone number again—Ordway 4040. I hope and plan that we can be alone for a couple of days anyway and have the weekend. I will either take Thursday and Friday off or Monday and Tuesday, whichever.''

The appellant testified that appellee admitted his illicit relations with Genie and her testimony in this

respect is corroborated by her mother and sister. Without extending this opinion, suffice it to say the evidence is convincing that appellee was living in a state of adultery with Genie.

If ground for divorce existed as alleged in the complaint, it would be barred by recrimination. § 34-1209, Ark. Stats., provides: "If it shall appear to the court that . . . both parties have been guilty of the adultery, or such other offense or injury complained of in the bill, then no divorce shall be granted or be decreed." This statute has been construed by this court as preventing one who has been guilty of conduct, which is a ground for divorce, from securing divorce upon another statutory ground.

In the case of *Wilson* v. *Wilson*, 128 Ark. 110, 193 S. W. 504, this Court said:

"Habitual drunkenness for one year and statutory cruel treatment are each grounds for divorce in our statute. Hence, each is a good recriminatory defense to the other. It is well settled that one who has been guilty of misconduct, which is in itself a ground for divorce, has no standing to demand a divorce upon another statutory ground. In such cases the parties will be denied relief because they are equally in fault." *Malone* v. *Malone*, 76 Ark. 28, 88 S. W. 840; *Healy* v. *Healy*, 77 Ark. 94, 90 S. W. 845.

In the case of *Young* v. *Young*, 207 Ark. 36, 178 S. W. 2d 994, 152 A. L. R. 327, this Court held that recrimination as a defense had been abolished where the ground for divorce was a three-year separation, but that recrimination is a good defense to all other grounds for divorce.

The case of *Widders* v. *Widders*, 207 Ark. 596, 182 S. W. 2d 209, is very similar to the case at bar, and Mr. Justice ROBBINS, speaking for the Court, said: "Before a suitor may be granted a divorce it must ordinarily appear that the party asking for the divorce is innocent and the one from whom the divorce is sought is guilty of some act or conduct which the law has designated as ground for divorce."

The appellee contends that the complaint should be treated as amended to include the allegation of jealousy on the part of his wife, as constituting a part of the charge against the appellant in connection with indignities, but when this is done, still the appellee has not made out a case when it is taken into consideration that his wife was very, very sick. She needed kindness, consideration, attention, love and affection, and instead she received the knowledge that appellee was bestowing his affections on someone else. Moreover, if the complaint is treated as amended, and as thus amended some ground for divorce other than a three year separation were proved, still the appellee would be barred by recrimination from obtaining a divorce.

Reversed with directions to enter a decree not inconsistent with this opinion.